**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

**REGINA RATOMA BERTRAND**
**FRAZEN,**

     **Plaintiff,**

**v.**

    **CIVIL ACTION NO.: 1:18-CV-64**
    **(JUDGE KEELEY)**

**NANCY BERRYHILL,**
**Acting Commissioner of Social Security,**

    **Defendant**.

## REPORT AND RECOMMENDATION

## I. INTRODUCTION

On March 26, 2018, Plaintiff Regina Ratoma Bertrand Frazen ("Plaintiff"), by counsel Jan Dils, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1).  On May 31, 2018, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings.  (Answer, ECF No. 8; Admin. R., ECF No. 9). On August 1, 2018, and September 6, 2018, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 13; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 14).  Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II. PROCEDURAL HISTORY

On August 2, 2012, Plaintiff protectively filed her first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on June 1, 2012. (R. 26). Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through July 18, 2012; therefore, Plaintiff must establish disability on or before this date. (R. 26). This claim was initially denied on October 9, 2012 and denied again upon reconsideration on December 18, 2012 (R. 1-6). On January 4, 2013, Plaintiff filed a written request for a hearing which was held before United States Administrative Law Judge ("ALJ") Karen B. Kostol on May 8, 2014, in Wheeling, West Virginia. (R. 82). Plaintiff, represented by counsel Harold Carpenter, Esq., appeared and testified, as did Linda Dezack, an impartial vocational expert. (Id.). On June 11, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. On March 24, 2016, the Appeals Council remanded the case to the ALJ.

A second and subsequent hearing was held before United States Administrative Law Judge ("ALJ") Randall W. Moon on December 5, 2016. Plaintiff, represented by counsel Ambria M. Adkins, Esq., appeared and testified, as did Larry Ostrowski, Ph.D., an impartial vocational expert. Id. at 51. On August 29, 2017, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 23-39).

### III.   BACKGROUND

**A.   Personal History**

Plaintiff was born on November 23, 1975, and was 36 years old at the time she filed this SSI claim. (R. 55). She completed high school, although she did not graduate with her class. (R.

2

58). Plaintiff's did not have prior work experience. (R. 38). She was married at the time she filed her initial claim (R. 51) and was in the midst of a divorce at the time of the administrative hearing. (R. 51). She has two dependent children. (R. 56). Plaintiff alleges disability based on bipolar disorder, migraines, severe dysplasia. (R. 26).

**B.     Medical History**

**1.   Medical History Pre-Dating Alleged Onset Date of June 1, 2012**

On November 30, 2011, Plaintiff underwent a Head CT with and without Contrast. The scan rendered an "unremarkable CT Scan of the Brain except for possible empty sella." (R. 391). On December 7, 2011, Plaintiff visited Park Valley Behavioral Health complaining of feelings of depression, with accompanying frequent episodes of anger, anxiety, and panic attacks. (R. 429). Plaintiff was prescribed Viibryd and was scheduled to return in one month. Id. On January 24, 2012, Plaintiff visited Park Valley complaining of significant problems stemming from her level of anxiety. Id. at 433. She complained of intense depression and anxiety, but denied thoughts, intentions or plans of suicide. Id. On March 1, 2012, Plaintiff visited Park Valley complaining of persistent anxiety, but denied feelings of hopelessness or helplessness, suicidal ideas, intentions or plans. Id. at 472. On April 4, 2012, Plaintiff visited Park Valley Behavioral Health complaining of feelings of anxiety, persistent insomnia, increased worrying, but denied feelings of hopelessness, helplessness, and suicidal ideas, intentions or plans. Id. at 432.[1]

**1.   Medical History Post-Dating Alleged Onset Date of June 2, 2012**

On August 2, 2012, Plaintiff was seen at Park Valley Behavioral Health complaining of persistent "depression with feelings of low energy [and] some difficulties concentrating." Id. at 431. Plaintiff wanted to discontinue her prescribed Luvox and was instead placed on Celexa. Id.

---

[1] Only the relevant medical records are discussed in this R&R. Plaintiff has sought treatment for a shoulder injury, a foot injury, and has seen a gynecologist. Those records are irrelevant to her mental health and are not discussed nor included. These records, however, were discussed in the ALJ's decision.

On January 18, 2013, Plaintiff visited Park Valley presenting with "worsening . . . feelings of anxiety." Id. at 471. The medical records indicate that Plaintiff "has difficulties with sleep, difficulties relaxing, increased anxiety and occasional panic attacks." Id. at 471. Plaintiff showed restricted affect and appeared perplexed at times. Id. On January 30, 2013, Plaintiff visited Dr. McFadden because of a recent depressive episode where she was unable to get out of bed for several days and did not have an appetite. Id. at 475.

Dr. McFadden noted that Plaintiff does not report self-destructive ideation, but exhibits depressive mood and feelings of hopelessness. Id. On February 12, 2013, Plaintiff visited Park Valley complaining of persistent feelings of depression, including an increase in anxiety and depression, intense low energy, and anhedonia. Id. at 470. On February 21, 2013, Plaintiff visited Park Valley complaining of persistent feelings of depression, an increase in anxiety and depression, and feelings of intense low energy and anhedonia. Id. at 479. On March 21, 2013, Plaintiff visited Dr. McFadden. Id. at 475. Plaintiff described being under a lot of stress, but disclosed that no significant changes had occurred. Id.

On March 21, 2013, Plaintiff visited Park Valley complaining of worsening depressive symptoms, inability to cope with her current circumstances, hopelessness or helplessness, but anhedonia and feelings of low energy. Id. at 478. On March 25, 2013, Plaintiff visited Park Valley complaining of mood instability and frequent episodes of anger. Id. at 524. Dr. Aguirre adjusted her medications because she stated that she has not made any improvements on Cymbalta. Id. On May 22, 2013, Plaintiff visited Park Valley complaining of feelings of depression and difficulties tolerating stress. Id. at 529. She reported "significant irritability and anger, as well as increased anxiety." Id. Plaintiff stated that "[s]he has tried already numerous medications including multiple mood stabilizers, Seroquel. She doesn't want to try any new

4

medications," and noted that mood stabilizers could be helpful. Id. at 529. On July 17, 2013, Plaintiff visited Park Valley complaining of persisting feelings of depression and intense anger, but appears calmer and denied suicidal ideas. Id. at 528.

On September 18, 2013, Plaintiff underwent a cervical spine MRI, which results showed "straightening of the cervical spine suggestive of underlying muscular spasm; congenital narrowing of the spinal canal on the basis of short pedicles; and midline posterior disk herniation at C4-5." Id. at 512. On September 19, 2013, Plaintiff visited Park Valley reporting improvement in her mood, but persistent anxiety and irritability. Id. at 527. On November 22, 2013, Plaintiff visited Park Valley reporting an improvement with her condition, although she still had feelings of intense anger, frustration, and anxiety. She stated that she had no feelings of hopelessness or helplessness and denied ideas of suicide.

On January 31, 2014, Plaintiff visited Park Valley complaining of difficulty controlling anger, but denied any suicidal ideas, intentions or plans. Id. at 525. Plaintiff wanted a new prescription anti-depressant due to headaches that she attributed to her current medication. Although she was warned by doctors that any new medication may not give the same effect, she insisted on a replacement prescription. Id. On March 25, 2014, Plaintiff visited Park Valley complaining of mood instability, episodes of irritability, getting upset easily, frequent episodes of anger, but denies suicidal ideas, intentions or plans. Id. at 524. Plaintiff states that she has not experienced major improvement on Cymbalta. Id. On May 9, 2014, Plaintiff visited Park Valley complaining of irritability and frustration. Id. at 549. Plaintiff complains that Cymbalta caused an increase in insomnia and restless, accompanied by irritability. Id.

On June 30, 2014, Plaintiff visited Park Valley complaining of depressive symptoms and anger, significant irritability, feelings of restlessness, inability to relax, feelings of intense

frustration, and emotional emptiness. Id. at 548. Plaintiff also reports "auditory hallucinations, sometimes vague and distant, mainly at night, that sometimes interrupt her sleep." Id. On July 15, 2014, Plaintiff visited Park Valley complaining of persistent feelings of low energy and depression, but denied suicidal ideas, intentions or plans. Id. at 547. On September 15, 2014, Plaintiff visited Park Valley who reported "persistence of feelings of irritability and anger, . . . [but] denies feelings of hopelessness or suicidal ideas, but admits to some degree of anhedonia and feelings of low energy." Id. at 570. Dr. Aguirre noted "restricted affect . . . [but] shows no evidence of psychomotor retardation or psychotic symptoms." Id.

On January 8, 2015, Plaintiff visited Park Valley exhibiting persistent anxiety, avoidant behavior, and occasional panic attacks. Id. at 545. The doctor noted that Plaintiff has occasional panic attacks, some avoidant behavior, continued anger and irritability, but denies any suicidal ideas, intentions or plans. Id. On February 9, 2015, Plaintiff visited Park Valley and reported persistent anxiety and depression with an increased avoidant behaviors. Id. at 544. Plaintiff appeared tense, fidgety, and expressed anxiety. Id. She exhibited avoidant behavior, intense anxiety, difficulty relaxing, occasional panic attacks, and restricted affect. Id. On March 26, 2015, Plaintiff visited Park Valley reporting on "significant feelings of anger and frustration." Id. at 543. Plaintiff stated that she exhibited avoidance behaviors, intense anxiety, difficulties relaxing, and occasional panic attacks. Id. Dr. Aguirre noted that Plaintiff "presented [with] very poor response to antidepressants over the years. In some cases antidepressants have worsened her symptoms." Id.

On April 23, 2015, Plaintiff visited Park Valley and reported persistent feelings of depression, low energy, low motivation, and "intense irritability and anger." Id. at 542. Plaintiff reported avoidant behavior with accompanying anxiety, difficulties relaxing, and occasional

panic attacks. Id. On May 21, 2015, Plaintiff visited Park Valley and reported persistent anger and irritability, with significantly increased headaches. Plaintiff reported avoidant behavior, intense anxiety, and difficulties relaxing and occasional panic attacks. Id. at 541. Dr. Aguirre continued Plaintiff on the same medications. Id. On June 18, 2015, Plaintiff visited Park Valley stating that her condition improved slightly, angry outbursts have decreased, and some feelings of depression and anxiety. Id. at 540. Plaintiff appeared tense, fidgety, and expressed some anxiety. Id. at 564. Plaintiff also expressed avoidant behavior, feelings of intense anxiety, difficulty relaxing, and occasional panic attacks. Id.

On July 22, 2015, Plaintiff visited Reynolds Memorial Hospital for a Head CT without Contrast. Id. at 762. The scan indicated that "[t]here is no hydrocephalus or other ventricular abnormality. There is no focal brain parenchymal abnormality, intracranial hemorrhage, mass effect or midline shift. The paranasal sinuses and mastoid air cells are clear." Id. Plaintiff also underwent a Chest Single View Frontal X-Ray, which demonstrated a normal heart size and clear lungs. Id. at 764. On August 5, 2015, Plaintiff visited Park Valley complaining of persistent anger outbursts and feelings of depression. Id. at 539. Plaintiff stated that she exhibits some "avoidance behaviors, as well as feelings of intense anxiety, difficulties relaxing and occasional panic attacks." Id.

On August 10, 2015, Plaintiff visited WVU Hospitals for a follow-up from Plaintiff's Glen Dale Emergency Room and Plaintiff's complaint of dizzy spells. Id. at 846. Plaintiff reported dizziness and/or vertigo and a history of seizures (one time), but no confusion, disorientation, no impaired memory, and no lack of awareness. Id. On September 25, 2015, Plaintiff visited Park Valley complaining of persistent angry outbursts, feelings of low energy,

avoidance of leaving the house, but denied any feelings of hopelessness and helplessness, and suicidal ideas, intentions or plans. Id. at 538.

On November 25, 2015, Plaintiff visited Park Valley complaining of "some feelings of depression." Id. at 537. She stated that her irritability has decreased somewhat, but has low energy and sometimes avoids leaving the house. Id. She has denied feelings of hopelessness and helplessness, and suicidal ideas, intentions or plans. Id. On December 3, 2015, Plaintiff visited East Ohio Regional Hospital complaint of dizzy spells, violent "physical pain," and random onset of sleeping. Id. at 616. On December 9, 2015, Plaintiff visited East Ohio Regional Hospital complaining of dizziness and poor tolerance to her treatment. On January 25, 2016, Plaintiff visited Park Valley for a follow-up on her symptoms of anxiety and depress. Id. at 560. Plaintiff reported an increase in her feelings of anger, significant anxiety, avoidance behavior, but denies feelings of hopelessness or helplessness. Id.

On March 24, 2016, Plaintiff visited Park Valley for a follow-up on her depression and anxiety. Id. at 559. Plaintiff reported an increase in anxiety, difficulties relaxing, feeling overwhelmed, and feelings of inability to cope. Id. The doctor reported that Plaintiff appears tense and reported feelings of low energy and anhedonia, difficulties controlling anger, but shows "no evidence of active psychotic symptoms," and some degree of restlessness. Id. at 559. On April 20, 2016, Plaintiff visited Park Valley for a follow-up complaining of persistent anxiety and anger and some avoidant behaviors. Id. at 581. Plaintiff reported that while she attended therapy, she has reported that it was "too stressful." Id. Plaintiff also reported low energy and anhedonia, but "shows no evidence of delusions or hallucinations" and "no evidence of cognitive impairment or thought disorder." Id. at 581.

8

On May 18, 2016, Plaintiff visited Park Valley for a follow-up appointment. Id. at 580. Plaintiff stated that she experienced improvement in sleep, but has experienced excessive sedation after the increase of her prescription. Id. Plaintiff stated that she keeps experiencing significant anxiety and intense aversion to leaving her house, accompanied with feelings of low energy. Id. Plaintiff reported "feelings of low energy and anhedonia, . . . no evidence of delusions or hallucinations." Id. On June 15, 2016, Plaintiff visited Park Valley reporting persistent insomnia, significant anxiety, feelings of low energy, and avoids leaving her house. Id. at 654. Dr. Aguirre increased Plaintiff's prescription of Luvox and will be seen for a follow-up visit in one month. Id.

On August 8, 2018, Plaintiff visited Park Valley for a follow-up on her depression and anxiety. Id. at 653. Plaintiff is reporting feelings of anxiety, depression, experiencing phobic symptoms, feelings of frustration about her functional limitations." Id. at 653. Dr. Aguirre reported that Plaintiff showed no evidence of delusions, hallucinations, feelings of hopelessness, helplessness, and cognitive impairment or thought disorder. Id. On October 4, 2016, Plaintiff visited Park Valley for a follow-up on her mood disorder. Id. at 652. Plaintiff reported difficulties coping, worsening racing thoughts, frustration and anger, feelings of low energy, anhedonia, and difficulties coping and feeling overwhelmed by her current problems. Id. at 652. On October 19, 2016, Plaintiff visited Park Valley for a follow-up on her anxiety and depression, complaining of increased anxiety, significant avoidant behavior, increase in anxiety, and ongoing symptoms of dizziness. Id. at 651. Plaintiff reported low energy, anhedonia, sornatic preoccupation, and "admits to some difficulties controlling her anger." Id.

On October 28, 2016, Plaintiff underwent an Echocardiogram at the Ohio Valley Medical Center due to chest pain, palpitations, dizziness, and vertigo. Id. at 873. The results of the

Echocardiogram showed: "Left ventricular ejection fraction in the 65% range. Trace mitral regurgitation." Id. Plaintiff also underwent a Holter Monitor and the results showed: "[t]he basic mechanism is sinus. The average heart rate was 105 with a rang of 63-160 beats per minute. No significant pauses. No ventricular ectopy. No atrial ectopy. No symptoms reported by the patient during the monitoring." Id. at 875. Plaintiff also underwent a Carotid Flow Study which did not "demonstrate stenosis in either carotid system. No plaque formation was identified in either carotid system. Both external carotid arteries and vertebral arteries were patent, demonstrating antegrade flow. The blood pressure on the right arm could not be obtained. On the left arm was 100/60." Id. at 876.

On November 4, 2016, Plaintiff visited WVU Hospitals for a second opinion regarding her vertigo. Id. at 719. Plaintiff describes "being awoke at night with a severe room spinning sensation that will last anywhere from a few seconds to several days," occasional complete and total hearing loss accompanied with complete vision loss. Id. at 719. On November 17, 2016, Plaintiff visited Park Valley for a follow-up for her anxiety and depression, complaining of persisting episodes of anger, "trouble with behaviors," avoidant behaviors, low energy, and anhedonia. Id. at 650.

### 2. Medical Reports/Opinions

On March 25, 2014, Dr. Aguirre completed an Adult Mental Impairment Question regarding Plaintiff's impairments. Id. at 513. Dr. Aguirre noted that Plaintiff suffered from Major Depression, Manic Disorder, and Personality Disorder. Id. The Questionnaire states that Plaintiff is prescribed Ambien, Cymbalta, and Klonopin, and the side effects of the medications include, dizziness, fatigue, memory loss, and sleeplessness. Id. Dr. Aguirre described Plaintiff had

moderate depression, frequent mood changes, irritability, and that major depression causes Plaintiff physical pain. Id. at 514.

Dr. Aguirre noted that Plaintiff demonstrated signs of "anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; thoughts of suicide; blunt, flat or inappropriate affect; feelings of guilt or worthlessness; impairment in impulse control; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; persistent disturbances of mood or affect; change in personality; emotional withdrawal or isolation; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); intense and unstable interpersonal relationships and impulsive and damaging behavior; disorientation to time and place; hallucinations or delusions; hypoactivity; manic syndrome; easy distractibility; memory impairment-short intermediate or long term; sleep disturbance; persistent irrational fear of a specific object, activity, or situation which results in compelling desire to avoid the decreased object, activity or situation; involvement in activities that have  high probability of painful consequences, which are not recognized; and a history of multiple personalities of several years duration beginning before age 30, that have caused the individual to take medicine frequently." Id. at 515-16.

Dr. Aguirre also noted marked restriction of activities of daily living; extreme difficulties in maintaining social function and maintaining concentration, persistence or pace; and one to two episodes of decompensation within 12-month period, each of at least two-week duration. Id. at 517. Dr. Aguirre noted that Plaintiff's impairments have lasted or are expected to last atleast twelve months. Id. The Questionnaire also described that Plaintiff has a moderately limited

ability to remember locations and work-like procedures, a not significantly limited ability to understand and remember very short and simple instructions, but no evidence of any limitation on the ability to understand and remember very long and detailed instructions. Id. at 519.

Dr. Aguirre also noted moderately limitations in her ability to carry out very short and simple instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to work in coordination with or proximity to others without being distracted by them; the ability to make simple work-related decisions; and the ability to complete normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Id. at 519-20. Dr. Aguirre also noted that Plaintiff was markedly limited in her ability to carry out detailed instructions and the ability to sustain an ordinary routine without special supervision. Id. at 519.

Dr. Aguirre also noted that Plaintiff has markedly limited ability to interact appropriately with the general public, the ability to ask simple questions or request assistance, and the ability to accept instructions and respond appropriately to criticism from supervisors. Id. at 520. Also, Plaintiff had no evidence of limitation on the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Id. at 520. Finally, Dr. Aguirre noted that Plaintiff had markedly limited ability to respond appropriately to changes in the work setting, the ability to be aware of normal hazards and take appropriate precautions, the ability to travel in unfamiliar places or use public transportation, and the ability to set realistic goals or make plans independently of others. Id. at 521.

C.    **Testimonial Evidence**

At the First ALJ hearing held on May 8, 2014, Plaintiff testified that she was born on November 23, 1975 and is 38 years old during the hearing. Plaintiff testified that she is married and resides in her home with her husband and two children, ages 17 and 14. She testified that she currently has her driver's license and she is able to drive, and her only limitations on her ability to drive is Plaintiff's lack of desire to leave her bed because she "hardly ever leave[s her] home." Id. at 88. Plaintiff testified that she completed high school and was in special education through out her schooling. Id. at 89.

Plaintiff testified that she has not worked since her first application for social security in 2008. Id. at 90. Plaintiff also testified that she has not held a full-time position for more than six months. Id. at 91. Plaintiff further testifies that she has a medical card, she receives food stamps, but does not get HUD housing. Id.   When asked why Plaintiff believes that she cannot work, Plaintiff stated: "[m]y mental state is just terrible. My memory, it's not vey good at all and I, you know, being on medicines for such a long time, I think it affects my memory. I could have a conversation with someone today and not remember what we talked about unless someone starts talking about the conversation and I'll get bits and pieces but honestly, I don't remember. My children will talk to me and says mom well you told me I could and I was like well, I don't remember." Id. at 91.

Plaintiff further testified that "I'm really depressed, my body like physically hurts and I won't get out of bed, I won't shower, it could be days. My husband, he, you know, begs me to go on a nice day and do things and I really don't want to leave my home. I won't leave my home for days or a week, you know, and it doesn't bother me. I stay most of my time in my room. The longest, you know, I've been out of my room is maybe for an hour or when I go to Pittsburgh to

take my son, that's the real longest I take time, you know, to take care of my son is when I go to Pittsburgh. But normally I seldom leave my home." Id. at 91-92.

Plaintiff further testified that that she suffered from migraines approximately three to four times a week. Id. at 96. She also testified that she takes Imitrex tabs and injections. Id. When asking if the mediation works, she stated that she takes "[o]ne or two of the tabs, if one doesn't help, I'll take another a couple hours later. But then I'm going to wind up having to take the injection and lay there and just let it go away on its own." Id. Her migraines usually last anywhere from 24 hours to 48 hours. Id. Plaintiff also testified that she had panic attacks which occur when she goes out in public because she believes "people are just talking and looking at" her. Id. at 96. Plaintiff testifies that she does not suffer from panic attacks when she is not out in public. Id.

She also testified that she was institutionalized/hospitalized in Hillcrest in 2007 or 2006, following her intentional overdose. Id. at 96. She testified that her treatment consisted on different medications and therapy. Id. at 97. She was seeing a counselor named Dr. McFadden, but he moved his practice and Plaintiff's care was transferred to "Megan," but had not seen her since Plaintiff's care had been transferred. Id. at 97. When asked about the problems with her memories and depression and migraines, Plaintiff testified that she "[has] so many personalities it's unreal." Id. at 97. She also stated that her "many personalities" are not good for her or her family and this is the reason she locks herself in her bedroom. Id. She testified that there are periods where she has blacked out, but, as testified to by her attorney, there was no other support for her dissociation and hallucinations other than what was contained in the records regarding this hospitalization. Id. at 98.

14

Plaintiff also testified regarding her daily activities. She states that she will cook, but after she cooks she will go back to her bedroom because her injury causes her injury from the car accident and her "room is [her] sanctuary." Id. at 92. Plaintiff testified that it was difficult for her to perform household chores due to her shoulder injury, like dishes, sweeping, or mopping the floor. Id. at 93. If Plaintiff has to go to the grocery store, she waits for her husband to get home so that he may carry the groceries "and things like that." Id. at 95.

During the Second ALJ hearing held on December 5, 2016, Plaintiff testified that she is married, but is going through "the divorce process" at the time of the hearing. Id. at 51. Plaintiff testified that she has two children that live at home with her, ages 17 and 20. Id. Plaintiff also provided testimony regarding her daily activities. She testified that it has been quite a long time since she left the house alone. Id. She testified that that was her routine and felt comfortable and safe in her home. Id. Plaintiff also testified that she spends her days "locked in her room . . . [f]or a very long time." Id. at 68. She stated that this began when she was a teenager and "would come home from school and go to [her] room and that's where [she] would pretty much stay." Id. at 69. She stated that she raised her two kids and took them to doctor appointments but not many school activities. Id. She does not leave the house to visit her children because they come to visit her, living so close. Id.

She testified that her youngest child, her 17 year old, has leukemia and travels to UPMC every month to get his blood levels checked. Id. at 57. Plaintiff testified that she did not go with her son to those meetings. Id. She testified that she has her driver's license, has the ability to drive, and her doctor has not put any limits on her driving, except due to her shoulder injury which required surgery. Id. at 58. When the Judge inquired as to what conditions lead her to believe that she cannot work, Plaintiff responded:

> I have all issues like I don't even want to leave the house. My anxiety and depression is so bad that that's where I stay, I'm in the house unless I have to go to a doctors appointment or maybe grab something at the store and then I take someone with me. I just don't feel right.

Id. at 61.

As to her treatment regarding her inability to leave the house, Plaintiff testified that she sees Dr. Aguirre once a month to discuss her medications "and things like that." Id. at 63. She has been seeing Dr. Aguirre since approximately 2006-07. Id. She stated that "[s]ometimes [her visits] are once a month or [she'll] skip a month and [she'll] go every two months. And then [they'll] decide what medicines are working, what's not working, and then [they'll] switch up on certain medications but that's about it." Id. She testified that she is currently on Abilify, Ambien, Klonopin, and Topomax and that the medications work, at times. Id. Plaintiff testified regarding her recent problems with dizziness. Id. at 64. She stated that her last doctor did not provide a diagnosis or cause of the dizziness, and "[t]hey're still digging into it." Id. With regard to her dizziness, Plaintiff stated:

> Well, I didn't have any for years and no one can give me answers. I can be dead asleep and it will wake me up out of my sleep and I can't see or hear. It could last seconds, minutes, or it can last days. It comes on with movement or no movement at all. And it's kind of scary because I just want to know what's going on. That's why I had the EKG and things like that done.

Id. at 64. She did not know if they have found anything on the EKG. Id.

> Q:     So, is the dizziness dailey, is it a few times a week, month, how often is it?
>
> A:     It can, it varies. I could be dizzy one day and then it will skip for a week or so, then instantly it will come back with no warning or anything like that. And just like I said, I could just be laying there watching TB and then I just start spinning. And it's kind of concerning.

Id. at 65.

16

Plaintiff also testified that she suffers from migraines approximately two times a week. Id. She testified that she receives Imitrex injections and tablets, but occur "the same" or as frequent as before she began her medication. Id. Plaintiff testified that they "could last for a couple days, couple hours with the vomiting, and . . . sensitivit[y] to light, things like that." Id. at 65. The Administrative Law Judge inquired about her multiple personalities; and, Plaintiff testified that she was still suffering from this illness. Id. at 67. Plaintiff testified:

> Well, it's kind of a thing in my family, like, my kids will call or someone will call and they'll say, who are you today. It's something I can't control. I don't know when I'm going to be different. I can laugh and having fun one minute and then the next I just turn, and I don't know why.

When asked whether Plaintiff receives treatment, she stated that "Dr. Aguirre has been talking to me about that." Id.

> ALJ:   And counsel, is there anything in the record that supports that. I mean, I think there was one mention of dissociation, of a history of dissociation in the past. Any diagnosis of dissociative disorder, anything that supports what this Claimant has said in that regard?
>
> ATTY:     Haven't seen anything other than what you've mentioned. I will, I will double check. If I do see something I will send you a post-hearing brief if I find it, but I haven't, I have not yet so far.
>
> ALJ:     Okay.
>
> ATTY:     Now, I mean the, are, there's the diagnosis of unspecified personality disorder but I know that it's pretty broad.
>
> ALJ:     Right.
>
> ATTY:     So, other than that, you know, nothing else.
>
> ALJ:     But there's been no treatment for dissociative disorder or any –
>
> ATTY:     Other –
>
> ALJ:     --specific addressing multiple personality disorder or –
>
> ATTY:     Just the treatment with Dr. Aguirre.

ALJ:     And that treatment has been counseling and medication management, correct?

ATTY:     Yes.

Id. at 67-68.

## D.   Vocational Evidence

During the first oral hearing, Linda Dezack a vocational expert testified.  Ms. Dezack testified that in her opinion, Plaintiff had "no additional specialized job training, trade school, or vocational school nor does she have military experience. Further, there's no past relevant work. Id. at 101. With regard to Plaintiff's ability to work, the Vocational Officer testified the following:

Q:     May I ask that you assume an individual with the same age, education and past work experience as the Claimant with the following abilities. That individual is capable of light exertional level work. That individual could never climb ladder, ropes or scaffolds, can perform all other postural activities on an occasional basis. That individual must avoid concentrated exposure to excessive noise, irritants such as fumes, odors, dust and gasses, and hazards such as dangerous moving machinery and unprotected heights. That individual is limited to simple routine and repetitive tasks and a low stress job defined as having only occasional decision making required, occasional changes in the work setting. No fast paced or strict production quotas. Said individual is capable of occasional interaction with the general public, coworkers and supervisors. Can an individual with these limitations perform the, or perform work?

A:     Based upon the hypothetical, yes, the individual would be able to perform the following jobs. *DOT* number 369.687-018, clothes folder, light exertional level, SVP: 2, 225 regional jobs, 200,000 national jobs. Next *DOT* number 222.687-014, garment sorter, light exertional level, SVP: 2, 189 regional jobs, 125,000 national jobs. Third, *DOT* number 261.687-014, laundry sorter, light exertional level, SVP: 2, 438 regional jobs, 100,000 national jobs.

Q:     Now if you add to that limitation of occasional overhead reaching bilaterally and frequent handling with the right upper extremity, would this hypothetical individual be capable of performing those jobs that you just stated?

A:     Yes.

Q:     If the, assume the same individual limitations as described in the first two hypotheticals with the additional limitation that said individual must be afforded the opportunity for brief one to two minute changes of position at intervals not to exceed 30 minutes without being off-task, would those jobs remain available?

A:     Yes.

Q:     If you add an additional limitation that said individual is capable of no interaction with the general public, would those jobs remain available?

A:     Yes.

Q:     At the sedentary exertional level with all of the limitations previously given, would there be jobs available?

A:     Yes.

Q:     What jobs would those be?

A:     Based upon the sedentary exertion level, *DOT* number 209.587-010, addresser, sedentary exertional level, SVP: 2, 140 regional jobs, 109,000 national jobs. Next, *DOT* number 249.5870-018, document preparer, sedentary exertional level, SVP: 2, 240 regional jobs, 120,000 national jobs. Third, *DOT* number 690.685-258, laminator, sedentary exertional level, SVP: 2, 175 regional jobs, 85,000 national jobs.

Q:     And if the individual were off-task or to miss work 20 percent of the work week or greater, would there be jobs available for this individual?

A:     There would be no jobs in the national economy that would allow 20 percent off-task. It's ten percent of the time or six minutes of sixty.

Q:     Is your testimony consistent with the information contained in the *DOT* and the SCO?

A:     It is.

Id. at 101-103.

Plaintiff's counsel cross-examined the Vocational Officer regarding the "light jobs."

Q: First, regarding the light jobs that you listed, if the hypothetical person were only to be able to have superficial less than occasional contact with coworkers and supervisors, would they be able to maintain those jobs?

> A:     Yes. As to perform actual job duties, there would be no or there would be no requirement for interaction with coworkers.
>
> Q:     And what about supervisors? Would they be able to limit their time away from supervisors that much?
>
> A:     Yes. In order to do these jobs independently, the individual would not need to have any more than superficial contact with supervisors.

Id. at  103-04.

The Vocational Officer also testified that these jobs would require the individual to be in a room by him/herself and be in rooms with others who were doing their jobs and that the location would vary. Id. at 104.  With regard to the sedentary jobs, the Vocational Officer stated that the Plaintiff's contact with co-workers and supervisors is the same as detailed above and that Plaintiff may be in the room with other people but would not require Plaintiff to have contact with those individuals to properly perform their job duties. Id.

During the second hearing, Larry Ostrowski, an impartial vocational officer provided testimony.

> Q:     There's no past work. I ask that you assume an individual of the same age, education, and past work experience as the Claimant with the following abilities. That individual is capable of light exertional level work, can never climb ladders, ropes, or scaffolds. Said individual must avoid concentrated exposure to any hazards such as dangerous moving machinery and unprotected heights. Said individual is limited to simple routine and repetitive tasks and a low stress job defined as having occasional decision-making required, occasional changes in the work setting, and no strict production quotas. Said individual is capable of no interaction with the general public and occasional interaction with coworkers and supervisors such that said individual is capable of working with things rather than with people. Said individual is capable of no overhead reaching bilaterally and frequent handling with the right upper extremity. Can an individual with these limitations, are there jobs available for such an individual?
>
> A:     Yes, You Honor. There would be the work of an office helper. This is alight and unskilled job with an SVP: 2. In the local economy there are 350 jobs, in the national economy 86,000 jobs. The *DOT* is 239.567-010. There would be the work of a marker. This is a light and unskilled job with SVP: 2. In the local economy there are 1,200 jobs, in the national economy 250,000 jobs. The *DOT* is

209.587-034. There would be the work of a mail clerk. This is a light and unskilled job, SVP: 2. This is a job in a mailroom of a business as opposed to working for the postal service. In the local economy, there are 400 jobs, in the national economy 71,000 jobs. The *DOT* is 209.687-026.

Q:      Thank you. Add a limitation that that individual must be afforded the opportunity for brief one to two-minutes changes of position at intervals not to exceed 30 minutes without being off task. Would the jobs that you stated remain available?

A:      The jobs of office helper and mail clerk would be but the marker job would not, Your Honor.

Q:      Would there be another job at the light exertional level that would fit the limitations given?

A:      Yes, Your Honor. There would be the work of an electrical accessories assembler. This is a light and unskilled job with SVP: 2. In the local economy there are 200 jobs. In the national economy 40,000 jobs. The *DOT* is 729.687-010.

Q:      If you add the limitation that said individual must avoid all exposure to any hazards such as dangerous moving machinery and unprotected heights would that eliminate any of those three jobs?

A:      No, Your Honor. My responses would be the same for electronic accessories assembler, mail clerk, and office helper.

Q:      And at the sedentary exertional level without the limitations previously given, would there be jobs available for this individual?
A:      Yes, Your Honor. There would be the work of a surveillance system monitor. This is a sedentary and unskilled job with SVP: 2. In the local economy there are 75 jobs, in the national economy 25,000 jobs. The *DOT* is 379.367-010. There would be the work of a document preparer. This is a sedentary and unskilled job with an SVP: 2. In the local economy there are 700 jobs, in the national economy 143,000 jobs. This is a sedentary and unskilled job with SVP: 2. In the local economy there are 70 jobs, in the national economy 10,000 jobs. The *DOT* is 739.687-182.

Q:      And if the individual were off task and would miss work 20 percent of work week or greater, would there be jobs available for this individual?

A:      No, Your Honor.

Q:      How much time off task do most employers tolerate?

A:     There are studies that show that an individual can be off task up to ten percent of a workday or a work period, and the individual still can maintain levels of productivity as required by employers.

Q:     Is your testimony consistent with the information contained in the *DOT* and *SOC*?

A:     Yes, Your Honor, with the exception of the sit, stand option and the issue regarding overhead reaching, my testimony is consistent with the *Dictionary of Occupational Titles* and the *Selective Characteristics of Occupations* jobs reference. My opinion regarding the issue regarding overhead reaching and the sit, stand option is based on my having performed a job myself, my having performed analyses of jobs or my having become familiar with how jobs are performed otherwise.

Id. at 72-74.

Q:     Dr. Ostrowski, to begin with, if a hypothetical person were limited to sitting, standing, and walking each total of one hour a day in an eight-hour day, could they perform any work?

A:     No.

Q:     And regarding the light jobs you listed, if the hypothetical person were limited to never reaching with the right upper extremity, never push, pull with the right upper extremity, occasional handling and fingering with the right upper extremity, occasional handling and fingering with the left upper extremity occasional reaching, handling, pushing and pulling, and frequent finger and feeling, would that limit the light jobs you provided?

A:     Yes. There would be no light jobs for such an individual.
Q:     What about the sedentary jobs?

A:     This individual would still be able to do the work as a surveillance system monitor. Well, let me check that out actually. Yes, This individual would still be able to do the work as a surveillance system monitor but not the work of a table worker or a document preparer.

Q:     And if the hypothetical person had a marked limitation, I'm going to define marked as affecting one-third to two-thirds of the workday, a marked limitation relating to the public, coworkers, and supervisors, and responding appropriately to usual work situations as in changes in routine work setting, could they maintain any type of full-time competitive work?

A:     No.

22

Id. at 74-75.

**E.      Report of Contact Forms or Disability Reports**

On October 4, 2012, a Disability Determination Report was completed by Philip E. Comer, Ph.D.(R. 137-148). Plaintiff stated that her initial claim for disability was made on July 18, 2012 alleging bipolar, migraines, and severe dysplasia CIN 2-3 which allegedly began on June 1, 2012. Id. at 138. The Report noted that Plaintiff has one or more medically determinable impairments, including affective disorder and anxiety disorder. Id. at 141. The Report indicated that "a full or partial manic or depressive syndrome" characterized by "appetite disturbance with change in weight, or sleep disturbance, or psychomotor agitation or retardation, or decreased energy, or difficulty concentrating or thinking." Id. at 142. With regard to anxiety-related disorders, the Report stated "[a] medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above." Id.

The Report noted a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two repeated episodes of decompensation, each of extended duration. Id. at 142. The Report further notes that "[e]vidence does not establish the presence of" an organic mental, schizophrenic, or affective disorder. Id. The Report indicated that the individual's medically determinable impairment can be reasonably expected to produce the individual's pain or symptoms, but the individual's statements regarding intensity, persistence, and functionally limiting affects are not substantiated by the objective medical evidence. Id. at 143. When assessing the credibility of the individual's statements, the Report considered the ADLs, precipitating and aggravating factors, and mediation treatment and found Plaintiff's statements to

be partially credible. Id. More specifically, the Report stated that the severity alleged by Plaintiff "does not appear to be supported by records." Id.

A Residual Functional Capacity Assessment was also completed on October 4, 2012, by Jeremy D. Louk, SDM. The Assessment found that Plaintiff had no exertional limitations, postural limitations, manipulative limitations, visual limitations, communicative limitations, but did have environmental limitations. Id. at 143-44.  Plaintiff could have unlimited exposure to extreme cold and heat, wetness, humidity, and vibration, but should avoid concentrated exposure to noise; fumes, odors, dusts, gases, poor ventilation, etc.; and hazards. Id. at 144.  Mr. Louk noted that "claimant's current RFC is non-severe with limitations in avoiding concentrated exposure of hazards, fumes, odors, dust, gases, poor ventilation and noise. The ALJ decision was reviewed. The ALJ limited the claimant to low stress due to migraines. Agree with this, Claimant has already been reduced to lose stress by psych mcs." Id.

A Mental Residual Functional Capacity Assessment was completed on October 4, 2012, by Philip E. Comer, Ph.D. Id. at 144. This Assessment indicated that Plaintiff had no understanding and memory limitations. Id. at 144. Furthermore, the Assessment noted that there was no significant limitation in her ability to carry out very short and simple instructions, ability to carry out detailed instructions, the ability to sustain an ordinary routine without special supervision, the ability to work in coordination with or in proximity to others without being distracted by them, and the ability to make simple work-related decisions. Id. at 145. The Assessment also noted that Plaintiff is moderately limited in the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance, and in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and

24

to perform at a consistent pace without an unreasonable number and length of rest periods. Id. at 145.

The Assessment also noted that Plaintiff has social interaction limitations and adaptation limitations. Id. The Examiner also determined that Plaintiff is not significantly limited in the ability to ask simple questions or request assistance, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, the ability to be aware of normal hazards and take appropriate precautions, the ability to travel unfamiliar places or use public transportation, and the ability to set realistic goals or make plans independently of others; and moderately limited in the ability to interact appropriately with the general public and the ability to respond appropriately to changes in the work setting. Id. at 145-46. Additional explanation was provided, stating: "claimant's statements are reasonably consistent with treatment records and are credible. However, she appears to have the mental/emotional capacity for work like activity in a work environment that has limited social interaction requirements and that can accommodate her physical limitations. Id. at 146. This Report determined that Plaintiff was "not disabled." Id. at 147.

On December 18, 2012, a Disability Determination Report at the Reconsideration Level was completed by Jeff Boggess, Ph.D. (R. 149-162). The Report indicated that there has been no change in her conditions since the last disability report. Id. at 153. The examiner noted that Plaintiff has a previously unfavorable decision in July 2009, noting that "claimant has the residual functional capacity to perform the physical demands of work at all exertional levels, she is limited to the performance of low stress work involving no high production rates, such as

assembly line work or high sales quotas, such as telemarketing and only occasional contact with coworkers, supervisor or the general public.

The Examiner also noted that currently

> when depressed, manic or have severe migraines, have to inject to ease the pain and throwing up, does nothing because body feels like it is being held down with bricks other times im manic and all day doing normal stuff such as laundry, cooking, cleaning, but if I go out into the public want to be alone, friends and oldest children help manage simple things, has problems with personal case due to migraines and depression, if I don't take my meds I am like a totally different person, fixes meals depending on how I feel, goes outside once or twice a week, does not go alone, drives, shops for food, clothes, things that are needed around the house, pays bills sometimes they are late because I get distracted, hobbies likes to listen to country music channel never changes, social activity, hang out with my neighbor or have a close friend come visit if I am up to having company, has problems with memory, completing tasks, concentration, understanding, following instructions and getting along with others, no physical inabilities noted, has a hard time understanding directions, does not deal with stress, the same routine is what gets me through a lot of stuff, fears, she is scared for her son, he has cancer, current meds: celexa, klonopin,, topamax, trazadone, and Imitrex.

Id. at 154.

The Review stated that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and concentration, persistence or pace, and one or two repeated episodes of decompensation, each of extended duration. Id. at 156. Dr. Boggess noted that one or more of the individual's medically determinable impairment can reasonably be expected to produce the individual's pain or other symptoms, but Plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms are not substantiated by the medical evidence. Id. at 156. The Examiner noted that the ADLs, precipitating and aggravating factors, and medication treatment were informative in assessing the credibility of the individual's statements. Id. at 156. Plaintiff seems "partially credible," but the "severity alleged does not appear to be supported by records." Id. at 157.

A Residual Functional Capacity was also completed by James Bind, MD on December 15, 2012. Id. at 157. The RFC described that Plaintiff had no exertional, postural, manipulative, visual, and communicative limitations, but does have environment limitations. Id. at 157. These limitations require Plaintiff to avoid concentrated exposure to noise; fumes, odors, dusts, gases, poor ventilation, etc.; and hazards (machinery, heights, etc.), but may have unlimited exposure to extreme heat and cold, wetness, humidity, and vibration. Id. at 157. The Examiner noted that "claimant's current RFC is non-severe with limitations in avoiding concentrated exposure of hazards, fumes, odors, dust, gases, poor ventilation and noise. The ALJ decision was reviewed. The ALJ limited the claimant to low stress do to migraines. Agree with this, claimant has already been reduced to low stress by psych mcs." Id. at 158.

A Mental Residual Functional Capacity Assessment was completed by Jeff Boggess, Ph.D. on December 17, 2012. Id. at 158. The Examiner noted that Plaintiff is not significantly limited in the ability to carry out very short and simple instructions, the ability to carry out detailed instructions, the ability to sustain an ordinary routine without special supervision, the ability to work in coordination with or in proximity to others without being distracted by them, the ability to make simple work-related decisions and moderately limited in the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Id. at 158.

The Assessment also noted that Plaintiff has social interaction limitations and adaptation limitations. Id. at 159. The Examiner concluded that Plaintiff is not significantly limited in the

ability to ask simple questions or request assistance, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, the ability to be aware of normal hazards and take appropriate precautions, the ability to travel unfamiliar places or use public transportation, and the ability to set realistic goals or make plans independently of others; and moderately limited in the ability to interact appropriately with the general public and the ability to respond appropriately to changes in the work setting. Id.  at 159. Additional explanation was provided, stating: "claimant's statements are reasonably consistent with treatment records and are credible. However, she appears to have the mental/emotional capacity for work like activity in a work environment that has limited social interaction requirements and that can accommodate her physical limitations." Id. This Report determined that Plaintiff was "not disabled." Id. at 161.

**F.    Lifestyle Evidence**

On an adult function report dated August 19, 2012, Plaintiff stated that her "migraines can be so severe at times they deterime wether or not I can lift my head out of bed or not. Bipolar I have my ups and downs up mean I'm so maniac I bouncing off the walls for days at a times and all of a sudden my brain just takes over and my body physically [illegible] and I may just crash for days and not want to leave my home or even shower. My mood swings are just so unpredictable." Id. at 340-347. In Plaintiff's description of her daily activities, Plaintiff wrote that "certain days I do what the average person may do have coffee get kids off to school school get dress and do normal things. Also days when those normal days turn into who am I because I can't get out of bed, because my body mentally wont le me." Id. at 341. Plaintiff stated that she takes care of her kids, given them dinner, and make sure the kids are clean. Id. Plaintiff reported

that her condition sometimes makes it difficult for her to sleep because her "brain won't stop thinking or racing so I take sleep meds for it. <u>Id.</u> at 341.

Plaintiff indicated there was no problem with personal care and prepares her own meals, although she does not cook as many home-cooked meals as she has previously due to the fact "it seems tiresome at times." <u>Id.</u>  Plaintiff stated that she cleans, does laundry twice a week, and does not need encouragement for these activities. <u>Id.</u> at 342. Plaintiff testified that her kids and friends help with the outside work and she only goes outside if "something's needed." <u>Id.</u> at 343. She reported that she uses a car to travel, sometimes, but hates being alone. <u>Id.</u> Plaintiff testifies that she shops in stores and by phone a couple times a month, but the shopping takes a while because she is "always forgetting why [she] went." <u>Id.</u> at 343. Plaintiff reported that she pays bills, counts change, uses a checkbook, and "sometimes I don't think before I spend and I find myself taking things back a lot forgetting about what I didn't pay." <u>Id.</u>

On November 20, 2012, Plaintiff completed a second adult function report. Plaintiff reported that "when your depressed, manic or have severe migraine when you have to inject urself with a needle to ease the pain and throwing up what work place will put up with ou calling off beause u can't move or even get out of bed. If not getting out bed your so manic bouncing off walls haven't slept in days running your mouth and really not saying anything people look at you like you're a weirdo or something." <u>Id.</u> at 354. Plaintiff reported that the people that know her can tell if she has taken her medication and her kids have told her that she is like "two different people wrapped in one." <u>Id.</u> at 355.

She stated that she sometimes cooks her own meals, depending on the day, and that she does not cook as much as she would like. <u>Id.</u> at 355. She stated that when she does go shopping, she buys "all different types of food," so that she can make a "full course meal or something that

can be put in the microwave." Id. With regard to laundry, she testified that she tries to do laundry every week or every two weeks, "hoping things calm down in my head a bit." Id. at 355. She reported that her children will try to help her when she is at her worse. Id. at 355. When describing her daily activities, Plaintiff described that she did "nothing at times body feels like I'm being held down with bricks, other times when I'm manic I'll run all day doing normal stuff, laundry, cook, clean but if I go out where the public is won't go alone. Id. at 356.

She reported that does care for her son who was diagnosed with Acute ALL and that her friends are a big help when she "just can't manage a simple day. Id. The Report indicated that Plaintiff takes Trazadone to assist in her sleep and that she is wakes up repeatedly through the night "just spinning with worry." Id. at 356. With regard to personal care, Plaintiff indicated that her migraines and depression affect her hygiene and she has lost weight because she will go without eating. Id. Plaintiff reports that she leaves the house once or twice a week when her son has an appointment and she will have someone come with her because of her nerves. Id. at 357. Plaintiff reported that she goes to stores to buy food, clothes, and household items, but shopping takes a while because she is always forgetting what she went to the store to get because she gets distracted. Id. The Report indicates that Plaintiff can pay her bills, but they are sometimes late because she is distracted with other things and she has to recount change a couples times to be sure. Id. at 357.

She has a neighbor and close friend who visit her to keep her company, but with decreasing frequency anymore. Id. at 358. When she has an appointment, she described needing them to call as a reminder the day before. Id. She reported that if she has not taken her medication she hates everyone and that her medication is necessary to "get along with anyone." Id. at 358. She described her attempt to leave the house once a week if she has not seen her

friends and her friends encourage her to go out to have fun. Id. 359. Plaintiff reported that she is

very shy and does not talk to many people because her concentration and memory level stops her

from completing things and she will forget what she is doing while doing it. Id. She described

difficulty understanding oral instructions, but can understand written instructions after reading

them several times. Id. at 359. Plaintiff stated that she cannot handle stress and that she just

wants to put her head through a wall, and that she is scared for her son who has cancer. Id. at

360.

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work exists in the immediate
> area in which he lives, or whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work…'[W]ork which exists in the
> national economy' means work which exists in significant numbers either in the
> region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-

step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If
> you do not have a severe medically determinable physical or mental impairment
> that meets the duration requirement . . . or a combination of impairments that is
> severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your
> impairments(s). If you have an impairment(s) that meets or equals one of our
> listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not

disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.  ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

1. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 416.920(b));
2. The claimant has the following severe impairments: affective disorder, with diagnoses of bipolar disorder and mood disorder; and migraine headaches (20 CFR 416.920(c));
3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926);
4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the physical demands of work at all exertional levels. She is limited to the performance of low stress work involving no high production rates, such as assembly line work, or high sales quotas, such as telemarketing, and only occasional contact with coworkers, supervisors, or the general public;
5. The claimant is unable to perform any past relevant work (20 CFR 416.965);
6. The claimant was born on November 23, 1975 and was 24 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR 416.963);

7.   The claimant has at least a high and is able to communicate in English (20 CFR 416.964);

8.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968);

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966); and,

10.   The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 416.920(g)).

(R. 119-28).

## VI.   DISCUSSION

### A.   Standard of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).

However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment … if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (quoting Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of

law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

"[Reviewing] courts are not to try the case de novo. At the same time, they must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951); Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964). As such, "[reviewing courts] do not reflexively rubber-stamp an ALJ's findings." Lewis v. Berryhill, 858 F.3d 858, 870 (4th Cir. 2017). There are some things an ALJ must do in reaching and explaining his decision. An ALJ has a basic duty of explanation; his decision must be sufficiently explained to permit a court to meaningfully review it. Radford v. Colvin, 734 F.3d 288, 295-95 (4th Cir. 2013). An ALJ must also "explicitly indicate[] the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984). An ALJ must provide an "accurate and logical bridge" from the evidence to his conclusion. Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016). There are also some things an ALJ may not do in reaching a decision. An ALJ may not selectively "cherrypick facts that support [his decision] while ignoring relevant evidence [to the contrary]." Lewis, 858 F.3d at 869. Moreover, while an ALJ is not required to discuss every piece of evidence, Reid v. Commissioner, 769 F.3d 861, 865 (4th Cir. 2014), an ALJ excludes relevant evidence at his peril.

In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.      Contention of the Parties**

Plaintiff, in her Motion for Summary Judgment, asserts that the Commissioner's decision "is based upon an error of law and is not supported by substantial evidence." (Pl.'s Mot. at 1). Specifically, Plaintiff alleges that:

- The ALJ erred by failing to comply with 20 C.F.R. 416.927 in assigning "less weight" to the opinion of Frazen's treating psychiatrist, Alfredo Aguirre, MD.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at [9], ECF No. 13-1). Plaintiff asks the Court to "remand the case to the Commissioner for a correction of the errors." (Id. at 13).

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. 14-2). Specifically, Defendant alleges that:

- The ALJ did not err in the decision because the decision was supported by substantial evidence

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at [9-10], ECF No. 14-3).

## C.    Analysis of the Administrative Law Judge's Decision

### 1.    Whether or not the ALJ appropriately gave Dr. Aguirre's treating physician opinion "less weight."

In consideration of the determination of whether an individual is "disabled," all medical opinions are considered "together with the rest of the relevant evidence." 20 C.F.R. § 416.927. More weight is generally given to the opinion of a doctor who has examined the patient rather than just reviewed medical records to make the determination. Id. Furthermore, treating sources are given more weight "since their sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained form the objective medical findings alone or from reports of individual examinations. Id. A "treating source" is defined as claimant's

35

"own acceptable medical source who provides [claimant], or has provided [claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with" claimant."

A treating physician's opinion will be given controlling weight when "the nature and severity of [the] impairment(s) is well supported by medically acceptable *clinical and laboratory diagnostic techniques* and is *not inconsistent with the other substantial evidence* in [the] case record." Craig v. Chater, 76 F,3d 585 (4th Cir. 1996). A medical opinion is an opinion "about the nature and severity of an individual's impairment(s) ad are the only opinions that may be entitled to controlling weight." Social Security Ruling 96-2 (rescinded effective March 2017). In the event, "a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). In these circumstances, an ALJ must give "less weight" to the treating physician's opinion because it is an error to give controlling weight in that circumstance. Id.; Social Security Ruling 96-2p.

> Whether a medical opinion is "not consistent" with the other substantial evidence is a judgment that adjudicators must make in each case. Sometimes there will be an obvious inconsistency between the opinion and the other substantial evidence; for example, . . . when two medical sources provide inconsistent medical opinions about the same issue.

Social Security Ruling 966-2p.

This does not mean that the treating source's opinion is completely rejected. Id. These sources' opinions are given deference and are subject to the factors found in 20 C.F.R. § 404.1527 and 416.927.

In an event that "controlling weight" is not given to a certain medical source, the ALJ must consider the following factors:

1.      The length of the treatment relationship and the frequency of examination;

2.      The nature and extent of the treatment relationship;

3.      Supportability;

4.      Consistency;

5.      Specialization; and,

6.      Other factors, including "any factors [claimant] or others brings to [the ALJ's] attention, or of which [the ALJ is] aware, which tend to support or contradict the medical opinion."

20 C.F.R. §§ 416.927. The Commissioner is required to present "good reasons" as to the determination or decision regarding the weight of the treating sources opinion. 20 C.F.R. § 416.927. These must be "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Social Security Ruling 96-2p.

There are certain determinations that, while may be influenced by the medical opinions, are solely reserved for the Commissioner. 20 C.F.R. § 416.927. These determinations include, 1) whether a claimant meets the definition of disabled or unable to work; and 2) whether the claimant's impairment "meets or equals the requirements of any impairment(s), the claimant's residual functional capacity, and the application of vocational factors. 20 C.F.R. § 416.927(d)(1-2).

When determining a claimant's residual functional capacity, the Commissioner will consider "any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations . . . limitations that result

from [claimants] symptoms, such as pain, provided by [claimant], [claimant's family], neighbors, friends, or other persons." 20 C.F.R. § 416.945.

When assessing someone's functional capacity, the Commissioner "will consider [claimant's] ability to meet the physical, mental, sensory, and other requirements of work," described below:

> (b) Physical abilities. When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.
> (c) Mental abilities. When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work.
> (d) Other abilities affected by impairment(s). Some medically determinable impairment(s), such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions, may cause limitations and restrictions which affect other work-related abilities. If you have this type of impairment(s), we consider any resulting limitations and restrictions which may reduce your ability to do past work and other work in deciding your residual functional capacity.

Id.

"The opinion of a treating physician does not bind the ALJ on the issue of functional capacity." Brown v. Astrue, 649 F.3d 193, n.2 (3d. Cir. 2011); see also, Morgan v. Barnhart, 142 Fed. App'x 716 (4th Cir. 2005). In fact, [t]he determination of a claimant's residual functioning capacity lies with the ALJ, not a physician, and is based upon all relevant evidence." Colvard v. Chater, 59 F.3d 165 (4th Cir. 1995).

> Treating source opinions on issues that are reserved to the Commission are never entitled to controlling weight or special significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to

make the determination or decision about whether an individual is under a
disability, and thus would be an abdication of the Commissioner's statutory
responsibility to determine whether an individual is disabled.

Social Security Ruling 96-5p (rescinded March 2017). A treating source opinion must never be
ignored because the ALJ is "required to evaluate all evidence in the case record that may have a
bearing on the determination or decision of disability." Id. The ALJ, instead, would evaluate the
medical sources on issues contained in 20 C.F.R. 404.1527(d) and 416.927(d).

The issue presented in Plaintiff's brief is two-fold. First, did the ALJ err for failing to
give a treating physician's opinion controlling weight and second, did the ALJ err by failing to
provide an adequate explanation of the reasons for the denial so that a reviewing court may be
able to review the decision.

The ALJ found:

that the claimant has the residual functional capacity to perform light work as
defined in 20 CFR 416.967(b) except the work must: never entail climbing of
ladders, ropes, or scaffolds; avoid all exposure to hazards such as dangerous
moving machinery and unprotected heights; entail no overhead reaching,
bilaterally; entail only frequent handling with the right upper extremity; be limited
to simple, routine tasks in a low stress job (only occasional decision making
required, occasional change in the work setting, and no fast paced or strict
production quotas); entail no interaction with the general public; and entail only
occasional interaction with co-workers or supervisors.

Id. at 29. This is the only section of the decision—the residual functional capacity determination-
-that Plaintiff is challenging which is evidenced by Plaintiff's reference to only these specific
passages in this subsection of the ALJ's decision. Plf. Memo, at 11-12. Plaintiff argues that Dr.
Aguirre's opinions should have been given "controlling weight" in this decision and in the event
the ALJ determined it should not, the ALJ should have applied the factors present in 20 C.F.R. §
416.927 in the analysis.

Plaintiff's residual functional capacity is a legal determination that is reserved for the Commissioner. While Dr. Aguirre's treating physician opinion may not be given "controlling weight," the ALJ must still consider the opinion (discussed below). Here, the ALJ was only required to use Dr. Aguirre's opinions in the evaluation of all of the evidence. That is precisely what the ALJ did it the analysis. The next determination is whether these factors were applied in the ALJ's decision and whether this was sufficiently explained so that a reviewing court would be able to determine the decision was based on substantial evidence. These factors include the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; Supportability; Consistency; Specialization; and, Other factors.

While the ALJ did not specifically note each piece of evidence that pertains to each factor, all of the factors were considered and examined throughout the seven-page analysis of Plaintiff's Residual Functional Capacity determination where the ALJ analyzed all of the evidence presented in the record, as required. The undersigned finds that the ALJ considered the required factors in 20 C.F.R. § 416.927 and has sufficiently provided reasoning behind giving Dr. Aguirre's opinion "less weight," for the following reasons:

Of the medical decisions provided in the record, the ALJ afforded "less weight" to Dr. Aguirre's opinions, "partial weight" to Dr. Sella's opinion, "some weight" to Ms. Coville, and "significant weight" to Drs. Comer and Boggess. Id. at 36-38. In the ALJ's determination to give Dr. Aguirre's opinion "less weight," the ALJ cited "Dr. Aguirre's own treatment notes, the claimant's conservative treatment, refusal of additional medications, and the claimant's noted improvement with continued treatment" as support for this decision. While Plaintiff argues that these general statements do not adequately described "good reasons" for assigning "less weight,"

the ALJ's preceding seven pages description and comment on the medical records and other evidence certainly contains "good reasons."

a. **Length, Frequency, Nature, and Extent of Treatment Relationship[2]**

The ALJ also examined the nature of the relationship between Dr. Aguirre and Plaintiff:

> While the medical evidence of record reflects a mental health condition that would be expected to cause some functional limitations, the claimant's conservative treatment indicates that her mental health condition is not as severe as alleged. In fact, Dr. Acquirre's (sic) treatment records indicates the claimant only sees him approximately one time a month for medication management and his objective findings generally found the claimant had no evidence of psychosis or hallucinations. Furthermore, the undersigned finds that limiting the claim to unskilled, low stress work that entails no interaction with the general public and only occasional interaction with co-workers or supervisors adequately accommodates any limitations the claimant may experience due to her mental health conditions.

Id. at 35. The ALJ categorized Plaintiff's visits with Dr. Aguirre as "routine treatment regarding her mental health condition." Id. at 35. The ALJ frequently noted that Dr. Aguirre's purpose as Plaintiff's doctor was to manage her medication and saw her once a month and sometimes every two months. The ALJ also noted and considered in "other factors" that Plaintiff refused the consistent suggestions from her treating physician to attend counseling, at times refusing and stating she "did not want to" go. Id. at 34.

b. **Consistency**

With regard to Plaintiff's own testimony, the ALJ reviewed and examined the inconsistencies between Plaintiff's testimony and someone who is totally disabled. Id. at 35. The ALJ noted that claimant can take care of herself and her children, transport son to Pittsburgh for

---

[2] The "supportability" factor does not apply in this situation. Supportability means: "The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion." 20 C.F.R. § 416.927. The medical opinion is based on his observations and does not explain how the doctor reached those conclusions, such as medical signs and laboratory findings.

his leukemia treatments/follow-ups, walk up and down flights, clean, do laundry, and have her friends and her family visit her. Id. Furthermore, the ALJ noted that "the claimant's self-described activities of daily living are not consistent with a totally disabled individual." Id.

c. **Other Factors**

With regard to Plaintiff's mental health treatment, the ALJ reviewed the medical records of Dr. Aguirre's tenure as Plaintiff's treating physician. The ALJ first noted that Plaintiff began seeing Dr. Aguirre in August 2012 at Park Valley Behavioral Health. (R. at 32). During the next six months, the ALJ noted that Plaintiff saw Dr. Aguirre approximately once a month for medication management. Id. The ALJ noted that Dr. Aguirre even determined on March 21, 2013 that a medication change was not done because, although Plaintiff was having worsening depressive feelings, Plaintiff had just begun a new medication, Latuda, a week prior and a follow-up was most appropriate. Id. The ALJ explained that on May 22, 2013, Plaintiff reported increased anxiety and significant irritability and anger, but did not want to try new medications even though her doctor believed the medication would assist Plaintiff. Id. The ALJ noted that "[t]he claimant's refusal to try new medications indicated that Plaintiff's mental health condition was not as severe as alleged. Id. In September and November 2013, the ALJ noted that the medical records indicate that Plaintiff's symptoms were improving.

Furthermore, the ALJ noted that "the claimant showed 'good response to the present medications' and showed no evidence of psychomotor retardation or psychotic symptoms, indicating to the undersigned that with medication management and continued treatment her symptoms significantly improve." Id. at 34. The ALJ also noted that in March 2015 that "claimant against reported feelings of anger and frustrating, but reported that she did 'not want to start therapy.'" Id. The ALJ noted that this indicated that her symptoms may not be as severe as

she has previously alleged. Id. The ALJ noted that in October 2016 and November 2016, Plaintiff was encouraged by Dr. Aguirre to seek counseling, however, Plaintiff refused. Id. at 35.

The ALJ was not required to give Dr. Aguirre's medical opinion "controlling weight" because the Residual Functioning Capacity determination is one that is reserved for the Commissioner. While not controlling, the ALJ was required to still consider this opinion with relation to all of the other evidence presented in the record. While Plaintiff argued that the ALJ did not sufficiently apply the factors required in 20 C.F.R. § 416.927 when examining a medical opinion, the ALJ did address and thoroughly analyze the applicable factors in narrative form.

## RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 13) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 17) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Choose an item., United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v.

Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this December 20, 2018

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE

44